DECISION
{¶ 1} Relator, Parris Pitstick ("relator"), commenced this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation. *Page 2 
 {¶ 2} Pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision including findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate concluded that the commission did not abuse its discretion and recommended that this court not issue a writ of mandamus. Relator filed objections to the magistrate's decision, and the commission filed a memorandum opposing the objections. This cause is now before the court for a full review.
 {¶ 3} Relator's only challenge to the commission's order was its evaluation of the nonmedical factors, which, together with the medical evidence demonstrating that relator has some residual functional capacity, formed the basis for the commission's decision that relator is capable of sustained remunerative employment and is not entitled to PTD compensation.
 {¶ 4} Dr. Brown opined that relator is capable of sedentary work but that his allowed condition of dysthymic disorder would require him to be in a "relatively structured" environment with an understanding supervisor. In his objections, relator maintains that the magistrate erred in finding no abuse of discretion in the commission's evaluation of the nonmedical factors, when, according to relator, "[t]his job simply does not exist[.]" This argument is without merit.
 {¶ 5} The relevant inquiry in a determination of permanent total disability is the claimant's ability to do any sustained remunerative employment. State ex rel. Domjancic v. Indus. Comm. (1994),69 Ohio St.3d 693, 635 N.E.2d 372. Dr. Brown specifically opined that relator's dysthymic disorder causes him only "mild impairment" and does not prevent him from performing sustained remunerative employment. The commission was *Page 3 
not required to accept the vocational evidence presented because the commission is the evaluator of disability, including the nonmedical factors.
 {¶ 6} The commission found that relator is capable of sustained remunerative employment. Where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond FoundryCo. (1987), 29 Ohio St.3d 56, 29 OBR 438, 505 N.E.2d 962. The commission's decision is supported by some evidence, and nothing in relator's objections persuades us otherwise. By his objections, relator asks this court to simply reweigh the evidence, but this is not the court's province; we review only for an abuse of discretion.
 {¶ 7} Having undertaken a review of relator's objections, considered the arguments of the parties, and independently appraised the record, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein, and we deny the requested writ of mandamus.
 Objections overruled; writ of mandamus denied. *Page 4 
 {¶ 8} In this original action, relator, Parris Pitstick, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation. *Page 5 
Findings of Fact: {¶ 9} 1. On November 9, 1987, relator sustained an industrial injury while employed as a diesel mechanic for respondent Bryce Hill, Inc., a state-fund employer. On that date, relator became pinned by a hoisted transmission. The industrial claim (87-50516) is allowed for "myofascial pain syndrome of lumbar area on the right; right inguinal hernia; dysthymic disorder; gastritis; peroneal nerve palsy; neurogenic bladder nos; incomplete bladder emptying; bilateral paraplegia nos; abnormality of gait and myalgia and myositis nos."
 {¶ 10} 2. On July 29, 2004, relator filed an application for PTD compensation. Under the education section of the application, relator indicated that the 11th grade was the highest grade of school he had completed and that occurred in 1975. He did not obtain a certificate for passing the General Educational Development ("GED") test. However, the PTD application form asks whether the applicant has gone to trade or vocational school or had any type of special training. In response, relator wrote: "Stained Glass, BVR; 1989-1997."
 {¶ 11} The application form poses three questions to the applicant: (1) "Can you read?" (2) "Can you write?" and (3) "Can you do basic math?" Given a choice of "yes," "no" and "not well," relator selected the "not well" response for the first query and the "yes" response for the second and third queries.
 {¶ 12} The application form also asks the applicant to provide information about his work history. Relator indicated that he was employed as a "heavy diesel mechanic" from July to November 1987 and that he worked six to eight weeks at that job. Relator was employed from January 1984 to July 1987 as a "Supervisor/Working Mechanic." *Page 6 
From 1977 to 1984, relator was employed in "Heavy Equipment Repair/Welding." During the years 1973 to 1977, relator delivered merchandise for two separate employers.
 {¶ 13} The application form also asks relator a series of six questions regarding the jobs that he has held. Regarding his job as a "Diesel Mechanic," the six questions and relator's responses are:
 Describe your basic duties — what you did and how you did it. Please provide as much detail as possible.
 1. Your basic duties: Worked on hydralic [sic] engines, body of cranes, dump trucks, semi trucks and all types of heavy equipment; test drive before and after repair.
 2. Machines, tools, equipment you used: Heavy wrenches, stick welders and mig welders, heavy lug wrenches and hand tools.
 3. Exact operations you performed: Brakes, tires, rear end and transmission; hydralic [sic] lift systems repairs.
 4. Technical knowledge and skills you used: Took heavy equipment repair courses at vocational school; learned about engines, welding and everything needed to do heavy duty equipment repair.
 5. Reading / Writing you did: Read repair manuals, maintenance books on all trucks.
 6. Number of people you supervised: 6 mechanics.
 {¶ 14} Regarding his job as a "Supervisor/working mechanic," the six questions and relator's responses are:
 1. Your basic duties: Same as job #1; Worked on hydralic [sic] engines and body of cranes, dump trucks, semi trucks; all types of heavy equipment; test drive before and after repair. *Page 7 
 2. Machines, tools, equipment you used: Stick and mig welders; heavy lug wrenches and hand tools.
 3. Exact operations you performed: Repair brakes, tires, rear end, transmission and hydralic [sic] lift systems.
 4. Technical knowledge and skills you used: courses at vocational school as stated in Job #1.
 5. Reading / Writing you did: Order parts, keep records of mechanics' work completed as well as my own.
 6. Number of people you supervised: 4 mechanics.
 {¶ 15} 3. On May 27, 2005, at the commission's request, relator was examined by Andrew Freeman, M.D. Dr. Freeman is board certified in occupational medicine. Dr. Freeman examined for all the physical conditions of the industrial claim with the exception of "dysthymic disorder and neurogenic bladder with incomplete bladder emptying." Dr. Freeman wrote:
 1. These allowed conditions have reached MMI.
 2. Based on the American Medical Association's Guides to the Evaluation of Permanent Impairment — 5th Edition, the whole person impairment for the allowed physical conditions in the claim is 42%. * * *
 {¶ 16} 4. Dr. Freeman also completed a physical strength rating form dated May 27, 2005. Thereon, Dr. Freeman indicated that relator is capable of performing "sedentary work."
 {¶ 17} 5. On May 23, 2005, at the commission's request, relator was examined by Martin Fritzhand, M.D. Dr. Fritzhand examined only for the "[n]eurogenic bladder. . . incomplete bladder emptying" conditions. Dr. Fritzhand wrote:
 * * * [T] patient sustained an "electrical shock" in November 2004, and has had persistent urinary retention since then. The patient has required intermittent self-catheterization over *Page 8 
the succeeding months. * * * The patient has reached maximum medical improvement. Based on the AMA Guides Fourth Edition, Section 11.3 was used to assess impairment. The patient has a Class C 2 impairment. It is my medical opinion that the patient has sustained a permanent partial impairment to the body as a whole of 25%. * * *
 {¶ 18} 6. On a physical strength rating form dated May 23, 2005, Dr. Fritzhand indicated that relator can perform "heavy work." He also wrote: "The above response only reflects the allowed conditions I have reviewed!"
 {¶ 19} 7. Previously, on October 19, 2004, at the commission's request, relator was examined by psychiatrist Donald L. Brown, M.D., who wrote:
 * * * I do not believe his allowed DYSTHYMIC DISORDER but [sic] prevents] him from returning to his former position of employment or other forms of sustained remunerative employment but he would have to be placed in an environment that was relatively structured and have an understanding supervisor. I believe it would cause him mild impairment in activities of daily living and concentration, persistence and pace with moderate impairment in socialization and adaptation.
 OPINION:
 In my opinion, Mr. Pitstick has reached MMI with respect to his previously allowed DYSTHYMIC DISORDER and it can be considered permanent. Utilizing the fourth edition of the AMA guides to the Determination of Permanent Impairment, I would rate him as a [sic] having a Class III level of impairment. This [is] a moderate level of impairment. Referencing the percentages from the second edition the fourth edition, I rate his impairment 35-40%.
(Emphasis sic.)
 {¶ 20} 8. Dr. Brown also completed an occupational activity assessment form dated October 19, 2004. The form asks the examining psychiatrist a two-part query: *Page 9 
 Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this injured worker meet the basic mental/behavioral demands required:
 To return to any former position of employment?
 To perform any sustained remunerative employment?
Dr. Brown answered "yes" to each query.
 {¶ 21} 9. In support of his PTD application, relator submitted an 18-page report dated July 14, 2005, from John P. Kilcher, a vocational expert. Kilcher wrote:
 * * * He would have acquired skills from his job [as] a Diesel Mechanic however, it is my opinion the skills were specialized, as they were unique to the work process and tools that he utilized and the equipment which he operated.
 In relation to the skill of Supervising that * * * he would have acquired from his job as a Diesel Mechanic, it is my opinion he could not utilize this skill to obtain another job in this capacity unless it was directly related to supervising Diesel Mechanics. In order for an applicant to be qualified to perform the job of a "working supervisor" they must have the knowledge of the activities which the employees are performing. Normally, a Supervisor of this type is promoted from within the company as they have an understanding of the process and equipment that the workers will be utilizing.
 * * * [I]t is my opinion the claimant would not have acquired any transferable or marketable skills and would be limited to obtaining a job, if he were physically and psychologically capable, which would be classified as "Unskilled."
 Based on the fact that Mr. Pitstick did not acquire any transferable or marketable skills and when further taking into consideration his reduced Residual Functional Capacity, it is my opinion the skills he would have acquired from his past jobs could not be reasonably developed to return the claimant to sustained, remunerative employment.
 Another factor that would prevent Mr. Pitstick from reasonably developing new skills that would return the claimant to *Page 10 
the labor force is his limited education without having the benefit of a GED, and his inferior academic capabilities. When considering these factors, I am of the opinion Mr. Pitstick does not have the ability to be retrained for a job through a formal training program that could be performed at his reduced Residual Functional Capacity.
(Fn. omitted.)
 {¶ 22} 10. Following a September 9, 2005 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order explains:
 The injured worker was examined at the request of the Industrial Commission by Dr. Freeman with respect to the allowed physical conditions in the claim other than the condition NEUROGENIC BLADDER WITH INCOMPLETE BLADDER EMPTYING. Dr. Freeman opined that the injured worker has reached maximum medical improvement considering those allowed conditions and has a resulting 42 percent whole person permanent impairment. Dr. Freeman completed a Physical Strength Rating Form which he attached to his medical report wherein he indicated that the injured worker is capable of performing sedentary work considering those allowed physical conditions. Sedentary work is defined on that form as meaning the ability to exert up to 10 pounds of force occasionally and a negligible amount of force frequently. It further involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are considered sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
 The injured worker was examined by Dr. Fritzhand at the request of the Industrial Commission with respect to the allowed physical condition Neurogenic Bladder with Incomplete Bladder Emptying. Dr. Fritzhand opined that the injured worker has reached maximum medical improvement considering that condition and has a resulting Class II level of impairment which he rated at 25 percent to the whole person. Dr. Fritzhand completed a Physical Strength Rating Form which he attached to his medical report wherein he indicated that the injured worker would be capable of performing heavy duty work considering the allowed Neuro-gentic [sic] Bladder Condition. Heavy work is defined on that *Page 11 
form as meaning the ability to exert 50 to 100 pounds of force occasionally, 20 to 50 pounds of force frequently, and 10 to 20 pounds of force constantly to move objects.
 The injured worker was evaluated by Dr. Brown at the request of the Industrial Commission with respect to the allowed psychological condition in the claim. Dr. Brown opined that the injured worker has reached maximum medical improvement considering the allowed psychological condition and has a resulting Class III level of impairment which he rated at 35 to 40 percent to the whole person. Dr. Brown opined that the allowed psychological condition would not prevent the injured worker from returning to his former position of employment or other forms of sustained remunerative employment. However, Dr. Brown opined that the injured worker would need to be placed in an environment that was relatively structured with an understanding supervisor. Dr. Brown opined that the allowed psychological condition would cause mild impairment in activities of daily living and concentration, persistence and pace, and moderate impairment in socialization and adaptation. Dr. Brown completed an Occupational Activity Assessment Form which he attached to his medical report wherein he reiterated his opinion that the allowed psychological condition would not prevent the injured worker from returning to any form of employment that he is otherwise qualified to perform.
 The Staff Hearing Officer finds that the injured worker is capable of performing sedentary employment considering the allowed physical conditions in the claim based on the opinions of Dr. Freeman and Dr. Fritzhand and in accordance with the definition of such work contained on the Physical Strength Rating Forms completed by both doctors and attached to their reports. The Staff Hearing Officer further finds that the allowed psychological condition would not prevent the injured worker from returning to his former position of employment or other forms of sustained remunerative employment. The Staff Hearing Officer finds that the injured worker would best be placed in an environment that was relatively structured with an understanding supervisor based on the opinion of Dr. Brown.
 The injured worker submitted the Vocational Report of Mr. Kilcher for consideration. Mr. Kilcher reviewed the injured worker's past work experience and opined that the injured *Page 12 
worker acquired skills as a result of his past work as a diesel mechanic, such as the ability to repair vehicles, the ability to use tools and equipment to repair vehicles, and the ability to supervise mechanics. Mr. Kilcher characterized the injured worker's past work experience as having been performed within the unskilled to skilled levels.
 The Staff Hearing Officer finds that the injured worker is 47 years of age, has an 11th grade formal education, and work experience as a merchandise deliverer and diesel mechanic. The Staff Hearing Officer finds that the injured worker's age is a vocational asset which would enable him to adapt to new work rules, processes, methods, procedures and tools involved in a new occupation. The Staff Hearing Officer further finds that the injured worker's education is adequate for performing entry level unskilled sedentary occupations. The Staff Hearing Officer finds that the injured worker would be unable to perform clerical job duties in sedentary occupations based on his testimony at hearing that he has difficulty reading. However, the Staff Hearing Officer finds that the injured worker would be capable of performing unskilled occupations and acquire new skills through on-the-job training. The Staff Hearing Officer further finds that the injured worker's past work experience did not provide him with transferable work skills to sedentary occupations. The injured worker did develop a familiarity with tools involved in automobile mechanics, which may aid in adapting to similar work environments in sedentary occupations. The Staff Hearing Officer finds that the injured worker would be able to access unskilled, entry level occupations in the sedentary range with primarily on-the-job training. Considering the injured worker's age, education and work experience in conjunction with his ability to perform sedentary work, the Staff Hearing Officer finds that the injured worker would be able to engage in sustained remunerative employment. The Staff Hearing Officer further finds that the injured worker would be a good candidate to participate in a structured vocational rehabilitation program designed for skill enhancement and re-employment. Accordingly, the application for Permanent and Total Disability Compensation is denied.
 This order is based on the medical reports of Dr. Andrew Freeman dated 05/27/2005, Dr. Martin Fritzhand dated 05/23/2005 and Dr. Donald Brown dated 10/19/2004. *Page 13 
(Emphasis sic.)
 {¶ 23} 11. On August 25, 2006, relator, Parris Pitstick, filed this mandamus action.
Conclusions of Law: {¶ 24} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 25} For its threshold medical determination, the commission, through its SHO, relied upon the medical reports of Drs. Freeman, Fritzhand and Brown. Based on the reports from those three doctors, the commission concluded that the industrial injury limited relator to sedentary employment and, further, that relator "would best be placed in an environment that was relatively structured with an understanding supervisor," as indicated by Dr. Brown.
 {¶ 26} Relator does not here challenge the reports from the three doctors as constituting some evidence upon which the commission can rely. Nor does relator challenge the commission's determination of his "residual functional capacity" based on the reports from the three relied upon doctors. See Ohio Adm. Code 4121-3-34(B)(4) for the definition of "residual functional capacity."
 {¶ 27} However, relator does challenge the commission's analysis of the nonmedical factors.
 {¶ 28} The commission may credit offered vocational evidence, but expert opinion is not critical or even necessary because the commission is the expert on the nonmedical issues. State ex rel. Jackson v. Indus.Comm. (1997), 79 Ohio St.3d 266. *Page 14 
 {¶ 29} Here, notwithstanding that relator submitted a vocational report from Kilcher, the SHO chose not to rely upon the Kilcher report. Rather, the SHO engaged in his own analysis of the nonmedical factors. Clearly, it was within the SHO's discretion to render his own analysis of the nonmedical factors. Jackson.
 {¶ 30} Here, relator points out that there is evidence that he "was placed in special education classes throughout his school career." (Relator's brief, at 6.) The magistrate notes that, in the history portion of his report, Dr. Brown reports his interview with relator: "`I was a slow learner but it was something I couldn't help.' He was in special education classrooms said he left school after the eleventh grade even though he only needed two credits."
 {¶ 31} Relator also cites to the Kilcher report which states:
 Dr. DeFeo, in completing the Individual Child Study determined Mr. Pitstick'[s] tendency to regress seems to limit his overall level of functioning and it seemed unlikely that he could succeed in heterogeneously grouped regular classes. The report demonstrated Mr. Pitstick's achievement in word recognition was significantly retarded as the claimant had word recognition abilities at the 3.5 grade level and arithmetic abilities at the 4.7 grade level.
 {¶ 32} Relator suggests here that the commission failed to consider or determine that he has "significant, pre-existing intellectual limitations" as allegedly indicated by the Kilcher report and Dr. Brown's report. Relator also argues that "[psychological testing documented a mild retardation level." (Relator's brief, at 6.)
 {¶ 33} It is the commission that weighs the evidence. Clearly, the commission was not required to draw the factual finding that relator seeks regarding his intellectual capacity simply because there may exist evidence of record that might support such *Page 15 
finding. The presumption here is that the commission considered the evidence of record but was not persuaded that relator has the "intellectual limitations" that he alleges here. Moreover, the magistrate notes that the commission did recognize that relator has "difficulty reading" as he so testified, but "difficulty reading" does not necessarily demonstrate "intellectual limitations."
 {¶ 34} Relator here challenges the SHO's determination that "the injured worker would be capable of performing unskilled occupations and acquire new skills through on-the-job training." According to relator, "[t]here is absolutely no evidence that Pitstick has the intellectual capacity or concentration for retraining." (Relator's brief, at 7.)
 {¶ 35} Again, the commission was not required to find that relator has the intellectual limitations or the mild retardation level that he alleges. There is indeed ample other evidence of record indicating that relator has the intellectual capacity for at least on-the-job training for unskilled employment as the commission found. In fact, relator's work history, as he self-reported on his PTD application, undermines his allegation of mild retardation given that relator reportedly supervised six mechanics while employed as a diesel mechanic.
 {¶ 36} Relator also asserts that "[t]he capability of performing work in a protected, structured work environment is not the standard to measure the ability to maintain sustained gainful employment." (Emphasis added.) (Relator's brief, at 9.)
 {¶ 37} To begin, Dr. Brown did not state that relator needed to be placed in a "protected" work environment. What Dr. Brown said was that relator should be placed in a "relatively structured" environment. *Page 16 
 {¶ 38} In any event, the standard to be applied by the commission in a PTD adjudication is whether the applicant can perform sustained remunerative employment. Relator cites to no authority indicating that sustained remunerative employment cannot be performed in the type of work environment proposed by Dr. Brown.
 {¶ 39} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus. *Page 1